# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**
    **Plaintiff,**

  v.                                                          Case No. 14-CR-186

**DEANDRE ANDERSON**
    **Defendant.**

## DECISION AND ORDER

Defendant Deandre Anderson moves for "compassionate release" pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons that follow, I grant his motion.

### I. FACTS AND BACKGROUND

On September 23, 2014, the government obtained an indictment charging defendant and his brother Deangelo Anderson with armed bank robbery, 18 U.S.C. § 2113(a), (d), and brandishing a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c). (R. 7.) On May 6, 2015, defendant pleaded guilty to the robbery count. (R. 41.) As stipulated in the plea agreement, on August 12, 2014, defendant and two others entered a Guaranty Bank branch in Milwaukee, wearing masks and latex gloves, while a fourth individual remained outside in a getaway car. Defendant's two accomplices leapt over the teller counter and removed approximately $4237 in United States currency, two dye packs, and approximately $500 in coins, which they placed inside a dark colored bag, while defendant remained on the customer side of the counter, brandishing a handgun with an extended clip. Following the robbery, the suspects fled in the vehicle waiting outside of bank. (R. 33 at 2.)

During the robbery, several bank employees recognized defendant as an individual who

had been at the bank approximately one month earlier with another individual, acting suspiciously. Bank surveillance recordings from July 14, 2014, showed an unmasked man, whose size and appearance were consistent defendant's, enter the bank wearing latex gloves. He was accompanied by another man who carried a dark colored bag, similar to the one carried during the robbery, and who wore sunglasses and latex gloves. Their behavior seemed odd to bank employees, as if they were "casing" the bank. When greeted by a bank employee, the men suddenly left without conducting any business. (R. 33 at 2-3.)

Following the robbery, law enforcement generated a wanted poster with photographic stills captured by bank surveillance cameras of the suspects in the July 14, 2014 incident and the August 12, 2014, robbery. On September 9, 2014, a State of Wisconsin Probation and Parole Agent contacted law enforcement because she had seen the wanted poster and recognized defendant, a former client. A citizen witness, who shared a family member with defendant, later came forward and also identified defendant as the man depicted in the surveillance photographs. (R. 33 at 3.)

Defendant was subsequently questioned by law enforcement, and he admitted he was the person depicted in the photograph from the bank taken on July 14, 2014. However, he denied that it was him in the photograph taken inside the bank on the date of the robbery. Defendant provided his cell phone number to law enforcement, and analysis of cell phone records revealed the Anderson brothers were in frequent contact with one another, including on July 14 and August 12, 2014, and that shortly before the robbery both of their cell phones connected with cell towers in close proximity to the Guaranty Bank. (R. 33 at 3.)

The day after the robbery, Deangelo Anderson was arrested after law enforcement found him driving the stolen getaway vehicle. Officers recovered a nine millimeter handgun with an

2

extended clip from the driver's side floorboard of the car, along with two cell phones and $561 in United States currency. (R. 33 at 3.)

Defendant's pre-sentence report ("PSR") documented a number of prior convictions: operating motor vehicle without owner's consent (twice) in 1999 and again in 2001; disorderly conduct in 2015; possession with intent to distribute cocaine in 2006; and possession with intent to distribute marijuana and felon in possession of a firearm in 2006. (PSR ¶¶ 40-45.) Defendant qualified as a career offender based on the two drug trafficking convictions, producing a guideline range of 188-235 months. (PSR ¶ 88.)

At the original sentencing hearing on August 4, 2015, Judge Randa imposed a sentence of 156 months, consistent with the government's recommendation. (R. 48, 53.) The Seventh Circuit subsequently vacated the sentence and remanded based on a Thompson error (R. 74), and the matter was re-assigned to me.

On August 3, 2016, I imposed a sentence of 126 months. In imposing a term somewhat below the guideline range (and the government's recommendation), I acknowledged that this was a serious offense, traumatic to the victims. The robbers were quite aggressive, jumping over the counter, ordering people down, and making death threats; the crime also appeared to have been planned. (R. 147 at 24-25.) A substantial prison sentence was needed to provide just punishment. A substantial sentence was also needed to protect the public, given defendant's prior record, which included car theft, drug trafficking, and unlawful firearm possession, and to deter, given his poor record on community supervision. (R. 147 at 25.)

I did take into account that defendant's prior record was non-violent and somewhat dated. He committed the car theft cases when he was 18 and 20, and the drug cases when he was 23 and 24. The drug cases appeared to have involved small amounts: 0.54 grams of

3

cocaine and 24 grams of marijuana. (R. 147 at 25; PSR ¶¶ 44, 45.)

I also considered defendant's conduct since the original sentencing. While he had not been afforded much of an opportunity to demonstrate rehabilitation, he had avoided disciplinary infractions. Finally, I noted that defendant attempted to cooperate with the government, providing information to law enforcement about two of the other participants in the bank robbery. (R. 147 at 25.)

Defendant is currently serving his sentence at USP Terre Haute, with a projected release date of August 27, 2023.[1]

On July 20, 2020, defendant filed a pro se request for compassionate release. (R. 177.) I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions, and on August 28, 2020, FDS filed a supplement in support of the motion. (R. 181.) The government has filed a response (R. 182) and defendant a reply (R. 183); the matter is ready for decision.

## II.  DISCUSSION

**A.    Compassionate Release Standards**

Pursuant to the First Step Act of 2018, the district may grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the

---

[1] https://www.bop.gov/inmateloc/ (last visited October 7, 2020).

4

extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court;[2] (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable § 3553(a) factors and the need to protect the public. See United States v. Rodriguez, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019).

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[3] The Commission's policy statement provides:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the

---

[2]In United States v. Scott, No. 17-CR-156, 2020 U.S. Dist. LEXIS 85554, at *9-16 (E.D. Wis. May 15, 2020), I determined that this "exhaustion" requirement is not jurisdictional and may in some cases be waived or excused.

[3]Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id.

5

factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1)   (A) extraordinary and compelling reasons warrant the reduction . . .

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

(A) Medical Condition of the Defendant.—

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

6

> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. "As a result, a growing consensus of courts across the country have concluded that, after the First Step Act, the Commission's policy statement does not constrain a court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction under § 3582(c)(1)(A)." United States v. Somerville, No. 2:12-CR-222-NR, 2020 U.S. Dist. LEXIS 93935, at *15 (W.D. Pa. May 29, 2020). In Scott, 2020 U.S. Dist. LEXIS 85554, at *17-18, I adopted this position.

Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release would need to demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. Id. at *20; see also United States v. Ramirez, No. 17-10328, 2020 U.S. Dist. LEXIS 83363, at *6 (D. Mass. May 12, 2020) ("The policy contained in section 1B1.13 serves as helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.") (internal quote marks omitted). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the

7

prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Black, No. 1:11-cr-00083, 2020 U.S. Dist. LEXIS 142523, at *11 (S.D. Ind. Aug. 10, 2020); United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020). The court must also consider whether release would pose "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

**B.     Analysis**

   **1.     Exhaustion**

Defendant indicates that he requested relief at his institution, which was denied by the warden on June 19, 2020.  (R. 177 at 2.)  The parties agree that the statute's exhaustion requirement is satisfied.  (R. 182 at 5, R. 183 at 2.)

   **2.     Extraordinary and Compelling Reasons**

For several reasons, I find that defendant has established a basis for release under § 3582(c)(1)(A)(i).

First, defendant suffers from a number of health issues, including hypertension, type 2 diabetes, sleep apnea, cardiac arrhythmia, obesity,[4] and heart disease, which increase his risk of severe illness from COVID-19.[5]  (R. 177 at 2, 7, 8, 13-14, 16; R. 181 at 1.)  Courts have recognized that prisoners with such co-morbidities may face even greater risk.  See, e.g., United States v. Jenkins, No. 16-cr-20229, 2020 U.S. Dist. LEXIS 146660, at *11 (E.D. Mich. Aug. 14, 2020); United States v. Ramirez, No. 19 Cr. 105, 2020 U.S. Dist. LEXIS 145800, at *5-6 (S.D.N.Y. Aug. 6, 2020); United States v. Ramsey, No. 18-CR-163, 2020 U.S. Dist. LEXIS

---

[4]Defendant has a BMI of 43.3 (R. 177 at 14), well above the level (30) for obesity. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity (last visited October 8, 2020).

[5]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited October 8, 2020) (listing heart conditions, obesity, and type 2 diabetes as conditions that increase risk of severe illness, and hypertension as a condition that might increase risk).

118681, at *10-11 (E.D. Wis. July 7, 2020) (collecting cases).[6]

Second, numerous inmates have tested positive at USP Terre Haute, which causes defendant to have genuine concerns for his own health. (R. 177 at 3, R. 183 at 5-6.) While the facility does not appear to currently be experiencing a severe outbreak,[7] the existence of positives within the prison suggests that defendant faces a clear risk of infection. As counsel notes in the supplement, COVID-19 has hit prisons and jails particularly hard, and once the infection reaches inside prison walls it is extremely difficult to contain. (R. 181 at 5.) The government notes the BOP's diligent efforts to stem further spread of the virus (R. 182 at 7), which I do not doubt, but given the realities of prison life I cannot accept the government's suggestion that defendant faces a comparable risk of infection in the community (R. 182 at 7).[8]

Finally, while rehabilitative efforts <u>alone</u> will not support compassionate release, the court may take such efforts into account as part of the analysis. See United States v. Brown, No.

---

[6]The government notes that defendant is currently stable, his conditions well-managed by medication. (R. 182 at 7.) Regardless of whether the BOP could effectively treat defendant under normal circumstances, the issue now is whether he faces risk of severe illness or death due to the COVID-19 pandemic. The government ultimately acknowledges that "some of his conditions render him more susceptible to serious illness if he contracts the virus. Therefore, Anderson's underlying medical conditions constitute one factor that weighs in favor of granting his motion for early release." (R. 182 at 7.)

[7]According to the most recent data from the BOP regarding USP Terre Haute, 6 inmates are positive, 1 staff member is positive, 2 inmates have died, 0 staff members have died, 81 inmates have recovered, and 2 staff members have recovered. https://www.bop.gov/coronavirus/ (last visited October 8, 2020).

[8]The CDC has noted that prisoners "live, work, eat, study, and participate in activities within congregate environments, heightening the potential for SARS-CoV-2 to spread once introduced," and that the ability of prisoners to exercise disease prevention measures such as frequent hand washing and social distancing may be limited due to the realities of prison life. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited October 7, 2020). In reply, defendant notes that USP Terre Haute is exceedingly overcrowded. (R. 183 at 5.)

10

4:05-CR-00227-1, 2020 U.S. Dist. LEXIS 87133, at *17-18 (S.D. Iowa Apr. 29, 2020).[9] Here, the record demonstrates that defendant has done remarkably well during his time in custody, maintaining a clear disciplinary record; working in the prison facilities department, learning valuable skills that will assist him in securing employment on release; and completing various additional classes. (R. 177 at 3, 177-1 at 20, 177-2 at 1, 13-14.) Defendant attaches to his motion various letters from supervisors attesting to his character and abilities. (R. 177-2 at 3-11.) In a June 9, 2020, letter, defendant's electrical worker supervisor indicates:

> Inmate Anderson has worked for me in the USP Electric shop for four years. I have never had any problems with him as a worker, he is the number one electrician on the electric crew. Anderson is a very good worker and a very good leader, he leads the inmate detail in performing various electrical tasks around the institution daily. Anderson is always willing to learn and try to accomplish new tasks, he is willing to jump in and help other shops out to complete various tasks as well. I believe Anderson has learned his lesson for the crimes that he has committed, and if given the chance to be released back to society he would be a contributing member of society.

(R. 177-2 at 3.) Another member of the electric shop indicates:

> Inmate Anderson has been a member of my work detail since December 2016. During this time he has always been to work on time. He has always been willing to help with whatever tasks needed done by the electric shop or facilities dept. Inmate Anderson has always kept a good attitude while being incarcerated. I believe inmate Anderson would refrain from returning to his former ways and be a productive member of society if given the opportunity.

(R. 177-2 at 4.) The facilities plumbing supervisor indicates:

> [Defendant] has always conducted himself in a professional manner. He has always displayed a great deal of respect for staff and inmates alike. Mr. Anderson has performed all assigned tasks in an expedient manner and has proven to be a very reliable worker. Mr. Anderson's attitude is upbeat and refreshing in a penal environment where there is often much negativity. In speaking with Mr. Anderson about his past criminal activity, he has often displayed remorse and regret for his actions. He spoke of growing up in a

---

[9] Rehabilitative efforts are clearly relevant in the § 3553(a) analysis.

11

> negative social environment when he was younger and did not have many of the same opportunities to achieve better things for himself. While incarcerated Mr. Anderson has maintained employment, met all financial restitution (FRP) obligations, perused educational interests, completed necessary programming requirements and maintained a very good disciplinary record, with zero incident reports during his time in incarceration. Overall Mr. Anderson has been nearly a model inmate with little to consider improving.

(R. 177-2 at 5.) The plumber foreman writes:

> Inmate Anderson is always on time and efficient with his work. At any time any of the shops will call [him in] to help out with small projects, Inmate Anderson is always willing to help and never a behavior problem. In over Four years inmate Anderson has not received any incident reports. I personally believe that inmate Anderson could be a productive member of society.

(R. 177-2 at 6.) The HVAC foreman states:

> Inmate Deandre Anderson is an exemplary model of what you would desire out of an inmate on a consistent basis. I have been employed with the Bureau of Prisons for 7 years and he stands out as a prime example of someone that has served their time to the fullest. He remains professional at all times, working exceedingly well with others in an environment where that isn't always the case. I cannot recall a single time that Mr. Anderson has not been punctual. He is one of the few inmates that you can count on to be at work, on time, every day. He is regarded by others and embraces the role of the number one electrician at FCC Terre Haute. . . . I could not think of finer example of an inmate that should be considered for release.

(R. 177-2 at 7.) The HVAC supervisor writes that defendant's experiences working in the department have given him "tenure in a structured lifestyle which would better prepare him for re-entry and increase his chances for success in modern day society." (R. 177-2 at 8.) The general maintenance foreman states:

> Mr. Anderson always reports to work on time and doesn't quit working until the end of the day. He is very knowledgeable and does an excellent job. He is always helping the other workers in our department. He is a team player. He always has a positive attitude and is helpful in training new employees. We have spoken several times about his past and future plans. He has a great attitude and is looking forward to a chance for a new beginning. . . . Given his good work ethic, discipline, and humility, I have no doubt that he will be an asset to society when he does get released.

(R. 177-2 at 9.) The engineering tech. writes:

> Inmate Anderson has a very good work ethic and always shows up for work. Inmate Anderson is a consistent leader in the electric shop and with the other workers in the department. He is always willing to help the other shops out to complete any work needed. It is my belief that the system has helped Anderson learn to be a productive and contributing member of society.

(R. 177-2 at 10.) The tool room officer writes: "Inmate Anderson has always been accountable showing up to work and accountable for any tools and equipment assigned to him. He has always been willing to help with any tasks that I have asked for him." (R. 177-2 at 11.)

Under these circumstances, defendant has shown extraordinary and compelling reasons for sentence modification.

### 3. Section 3553(a) Factors

The government primarily opposes relief under the § 3553(a) factors. (R. 182 at 7.) As the government correctly notes, this was an extremely serious crime, pre-planned, committed by a man in his 30s who should have known better and learned from his past mistakes. (R. 182 at 8.) Had defendant brought this motion after serving but a fraction of his sentence, the balance might tip in the other direction. But defendant has already served a majority of his sentence; he has less than three years remaining. He has been punished for his crime. Moreover, even reduced to time-served, the instant sentence is still about three times longer than any of his previous sentences, thus producing sufficient deterrence. See Ramsey, 2020 U.S. Dist. LEXIS 118681, at *13-14 (citing United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("It is appropriate for a court, when considering the type of sentence necessary to protect the public and deter future misconduct, to note the length of any previous sentences imposed. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has

13

already served serious time yet continues to re-offend.")).

The government also discusses the need to protect the public, noting that prior to his most recent incarceration defendant had no legitimate employment history and earned money trafficking drugs. He also had a poor record on prior terms of community supervision. (R. 182 at 8.) But this history is what makes defendant's prison conduct, discussed above, all the more significant. His conduct gives the court reason to believe that if he released he will not return to criminal activity or otherwise endanger the public. For someone who entered the BOP with very little work history, defendant has set himself up well to enter the workforce in a skilled trade on release. The letters from defendant's prison work supervisors, quoted above, are truly impressive, unlike any I have seen in this context. The government notes that we expect prisoners to behave and engage in programming (R. 182 at 9), but defendant's efforts far exceed expectations. His opportunity to now find legitimate work, in a skilled trade, will reduce the chances that he will return to crime.

Finally, defendant appears to have a solid release plan in place, as discussed in the supplement filed by counsel. (R. 181 at 11.) He will also be on supervised release for four years, which will ensure monitoring for protection of the public.

### III. CONCLUSION

The government forthrightly admits that defendant's "circumstances represent a close call," and that "reasonable minds might disagree about the merits of his motion." (R. 182 at 9.) On review of the medical evidence, which demonstrates that defendant suffers from a number of conditions that greatly increase his risk of severe illness from COVID-19; the existence of COVID-19 infections inside his facility; and his prison record, which shows that he has made great strides in self-improvement, I conclude that the motion should be granted.

14

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 177) is granted, and his prison sentence is reduced to time-served. All other terms and conditions of the previous sentence will remain as fixed. An amended judgment shall issue forthwith.

Dated at Milwaukee, Wisconsin, this 8th day of October, 2020.

/s Lynn Adelman
LYNN ADELMAN
District Judge